UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **NICOLE E. VALENTINE,**<br><br>               Plaintiff,<br><br>          v.<br><br>**CAROLYN W. COLVIN**, Acting Commissioner of Social Security,<br><br>               Defendant. | CV-14-393-FVS<br><br>**ORDER DENYING THE PLAINTIFF'S SUMMARY JUDGMENT MOTION AND GRANTING THE DEFENDANT'SUMMARY JUDGMENT MOTION** |

**THIS MATTER** comes before the Court without oral argument based upon the parties' cross motions for summary judgment.  Plaintiff Nicole E. Valentine is represented by Dana Madsen.  The defendant is represented by Nicole Jabaily.

**JURISDICTION**

On September 7, 2011, Nicole E. Valentine applied for Title XVI supplemental security income ("SSI").  42 U.S.C. §§ 1381-1383f; 20 C.F.R. Part 416.  The Social

1

Security Administration ("SSA") denied her initial application for benefits, together with her request for reconsideration.  She asked for, and was granted, a hearing before an administrative law judge ("ALJ").  The ALJ issued an unfavorable decision.  Ms. Valentine's attorney requested the Appeals Council to review the ALJ's decision.  On October 28, 2014, the Appeals Council decided not to do so.  At that point, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1400(a)(5).  Ms. Valentine commenced this action on December 9, 2014.  42 U.S.C. §§ 405(g), 1383(c).  Both she and the Commissioner move for summary judgment.

**BACKGROUND**

Nicole E. Valentine was born on August 22, 1988.  (TR 42.)  She dropped out of high school (TR 43), and, at age 16, she married a 40 year old man.  (TR 19.)  He died approximately five years later.  Since then, she has lived with boyfriends.  (TR 48-49, 294.)  She has yet to obtain a high school diploma or pass the General Educational Development ("GED") tests, though she has

studied for the latter and hopes to pass them.  (TR 43.)
Lack of education is not the only challenge she faces.
Body weight is another.  Her ratio of weight to height is
unhealthy, something she recognizes.  (TR 282.)

At the administrative hearing, Ms. Valentine
testified she suffers from physical impairments.  She
said she experiences significant pain in her feet, legs,
and back.  (TR 45.)  She says the pain is disruptive.
She cannot stand very long, walk very far, or climb many
steps.  (TR 45-46.)  When she is grocery shopping, she
must sit in an electric cart.   (TR 46.)  She finds it
difficult to perform basic household tasks (TR 48), and
she has been unable to hold a job. (TR 44.)

Ms. Valentine also testified she suffers from mental
impairments.  She experiences nightmares, and she finds
it difficult to sleep.  (TR 47.)  In addition, she
suffers from acute depression and anxiety.  *Id.*  Among
other things, these impairments have impeded her ability
to pass the GED tests.  (TR 43.)  Finally, she suffers
from severe panic attacks.  (TR 47, 48.)

**ALJ'S DECISION**

A person is disabled "if [s]he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The SSA has established a five-step process for evaluating a disability claim.  20 C.F.R. § 416.920(a)(4).  If, at any step, an ALJ can determine the claimant is disabled (or not disabled), the ALJ will do so.  *Id.*  In that event, the ALJ will not proceed to the next step.  *Id.*  The process is complete.

A. Step One

At step one, Ms. Valentine had to show she is not engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  The term "[s]ubstantial gainful activity means work that . . . (a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit."  20

4

C.F.R. § 416.910.  The ALJ found Ms. Valentine has not
engaged in any substantial gainful activity since the
date upon which she applied for benefits, *viz.*, September
7, 2011.  (TR 14.)

B. Step Two

At step two, Ms. Valentine had to show she has "a
severe  medically determinable physical or mental
impairment that meets the duration requirement in §
416.909, or a combination of impairments that is severe
and meets the duration requirement[.]"  20 C.F.R. §
416.920(a)(4)(ii).  An impairment is "severe" if it
"significantly limits" the claimant's "physical or mental
ability to do basic work activities."  20 C.F.R. §
416.920(c).  The ALJ had no trouble finding Ms. Valentine
suffers from a number of severe mental impairments, *viz.*,
depressive disorder, anxiety disorder, personality
disorder, and marijuana abuse.  (TR 14.)  Ms. Valentine's
alleged physical impairments were another matter.
Although the ALJ acknowledged she experiences pain, the
ALJ found the pain does not significantly limit her

ability to engage in basic work activities.  As a result, the ALJ concluded she does not suffer severe physical impairments.  (TR 15.)

C. Step Three

At step three, the ALJ considered whether Ms. Valentine's impairments are so severe she is conclusively presumed to be disabled.  *See Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir.1998).  Resolution of the issue turns upon whether Ms. Valentine has any impairment, or combination of impairments, that equals an impairment that is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 416.920(a)(iii), 416.925(a).  *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1194 (9th Cir.2004).  SSA regulations state:

> The Listing of Impairments (the listings) is in
> appendix 1 of subpart P of part 404 of this
> chapter.  For adults, it describes for each of
> the major body systems impairments that . . .
> [the SSA considers] to be severe enough to
> prevent an individual from doing any gainful
> activity, regardless of his or her age,
> education, or work experience.

20 C.F.R. § 416.925(a).  "When a claimant meets or equals a listing, 'he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.'"  *Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir.2013) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)).  The claimant bears the burden of proof at step three.  *See, e.g., Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir.2012).  In this instance, the ALJ decided Ms. Valentine has not demonstrated the existence of either an impairment, or a combination of impairments, that equals an impairment that is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Consequently, the ALJ concluded she failed to establish a conclusive presumption of disability.

D. Step Four

At step four, the ALJ evaluated whether Ms. Valentine can perform her "past relevant work" given her "residual functional capacity."  20 C.F.R. § 416.920(a)(4)(iv). The SSA defines "past relevant work" as work that "was

7

done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity." 20 C.F.R. § 416.965(a).  Ms. Valentine's residual functional capacity ("RFC") is the most she can do in a work setting despite her physical and mental limitations. 20 C.F.R. § 416.945(a)(1).  In assessing Ms. Valentine's RFC, the ALJ had to consider "all of the relevant medical and other evidence."  20 C.F.R. § 404.1545(a)(3).  Among other things, the ALJ considered Ms. Valentine's testimony, the records that were admitted into evidence (which included the observations of a number of mental health professionals and health care providers), and the opinions of a non-examining medical expert.  (TR 31-34.) The ALJ found:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  she would be able to understand, remember, and carryout simple, routine, and repetitive tasks/instructions involving up to three step commands and well learned complex tasks; she should have no

> interaction with the public; could have only
> occasional and superficial interaction with
> coworkers; and would need additional time
> (defined as 10% more than the average employee)
> to adapt to changes in the work setting or
> routine.

(TR 17.)  This is Ms. Valentine's RFC.  Having made this determination, the ALJ turned to her "past relevant work."  20 C.F.R. § 404.1565(a).  She found Ms. Valentine is unable to perform her past relevant work given her RFC.  (Tr. 22.)  Thus, the ALJ moved to step five.

E. Step Five

At step five, the burden shifts to the commissioner to provide "evidence that demonstrates that other work exists in significant numbers in the national economy that [Ms. Valentine] can do, given [her] residual functional capacity and vocational factors."  20 C.F.R. § 404.1560(c)(2).  As a general rule, there are two ways the Commissioner may satisfy her burden:  "(1) by the testimony of a vocational expert, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404,

9

subpt. P, app. 2." *Lounsburry v. Barnhart*, 468 F.3d
1111, 1114 (9th Cir.2006). At the hearing on June 4,
2013, the ALJ considered the testimony of a vocational
expert. The ALJ asked her whether jobs exist in the
national economy for an individual with Ms. Valentine's
profile. (TR 22.) The vocational expert responded in
the affirmative. She said Ms. Valentine could work as a
fish cleaner, a dining room attendant, or a laundry
worker. (TR 23.) The ALJ credited the vocational
expert's testimony:

> [C]onsidering the claimant's age, education,
> work experience, and residual functional
> capacity, the claimant is capable of making a
> successful adjustment to other work that exists
> in significant numbers in the national economy.
> A finding of "not disabled" is therefore
> appropriate . . . .

(TR 23.)

**STANDARD OF REVIEW**

A district court has "power to enter, upon the
pleadings and transcript of the record, a judgment

affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without
remanding the cause for a rehearing."  42 U.S.C. §
405(g).  However, review is limited.  "The findings of
the Commissioner of Social Security as to any fact, if
supported by substantial evidence, shall be
conclusive[.]"  *Id.*  As a result, the Commissioner's
decision "will be disturbed only if it is not supported
by substantial evidence or it is based on legal error."
*Green v. Heckler*, 803 F.2d 528, 529 (9th Cir.1986).
"Substantial evidence" means more than a mere scintilla,
. . . but less than a preponderance."  *Desrosiers v.
Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th
Cir.1988) (internal punctuation and citations omitted).

**PLAINTIFF'S ALLEGATIONS**

Ms. Valentine does not challenge the ALJ's Step Two
finding regarding her physical impairments.  (Plaintiff's
Motion for Summary Judgment at 9.)  By contrast, Ms.
Valentine does challenge the ALJ's formulation of her
residual functional capacity.  According to Ms.

11

Valentine, the ALJ improperly discounted her description
of her psychological symptoms.  Not only that, but also
Ms. Valentine alleges the ALJ failed to give adequate
weight to the observations and opinions of the health
care providers and mental health professionals who either
examined her or reviewed her medical records.  Given the
alleged flaws in the ALJ's assessment of the evidence,
Ms. Valentine urges the Court to reverse the ALJ's
unfavorable decision and order the Social Security
Administration to pay SSI benefits.

**PSYCHOLOGICAL/MEDICAL EVIDENCE**

Ms. Valentine was evaluated by Mahlon Dalley, Ph.D.,
a psychologist, on two occasions.  The first evaluation
took place on June 3, 2011.  Although Ms. Valentine "did
not present with depressive features" (TR 179), the
psychological tests Dr. Dalley administered that day
indicated "many difficulties with depression and
anxiety."  *Id.*  At the conclusion of the 2011 evaluation,
Dr. Dalley issued a number of recommendations.  Among
other things, he wrote, "[F]eatures of Ms. Valentine's

depression, panic attacks, and personality disorder are likely to interfere with her ability to initiate and be successful in a normal employment position; therefore, it is estimated that she will be work impaired for a 6 to 9 months time period." (TR 184.)

Dr. Dalley's 2011 report was reviewed separately by psychologists Michael Regets, Ph.D., and Leslie Postovoit, Ph.D. (TR 55, 65.) Both psychologists concluded Ms. Valentine suffers from a number of moderate limitations. For example, both psychologists concluded her "ability to understand and remember detailed instructions" is "[m]oderately limited." (TR 61, 72.) Similarly, both psychologists concluded Ms. Valentine's "ability to perform activities within a schedule, maintain regular attendance, and be punctual" is "[m]oderately limited." (TR 62, 71.)

Dr. Dalley conducted a second evaluation of Ms. Valentine on March 3, 2012, *i.e.*, approximately nine months after the first evaluation. (It does not appear Drs. Regets and Postovoit saw the results of the second

13

evaluation.)  As he had during 2011, Dr. Dalley administered a number of psychological tests.  The results were troubling.  Ms. Valentine's performance on the tests indicated malingering, which was Dr. Dalley's diagnosis.  (TR 201-03.)  He recommended a revaluation of Ms. Valentine, but only in the event she became willing to give more realistic responses to the questions on the various psychological tests.  *Id.* at 203.

During 2012, Ms. Valentine was examined on a number of occasions by health care providers at the Community Health Association of Spokane ("CHAS").  She consistently reported depression and anxiety.  (TR 277, 282, and 294.) On two occasions, she reported ankle and back pain.  (TR 277, 282.)  Health care providers accepted her reports of depression and anxiety, *id.*, but they were unable to substantiate her reports of ankle and back pain.  (TR 284.)  Her last appointment during 2012 took place on October 12th.  At that point, Ms. Valentine felt "her motivation and mood [had] improved.  (TR 294.)

14

At the ALJ's request, Ms. Valentine's psychological records were reviewed by Kent Layton, Psy.D.  He testified at the administrative hearing.  In his opinion, Ms. Valentine is capable of working, although he acknowledged she should have limited contact with the public and her supervisors would need to accommodate her personality disorders.  (TR 41.)  The ALJ placed significant weight on Dr. Layton's assessment of Ms. Valentine's psychological records.  The ALJ placed some weight on the reviews that were conducted by Drs. Regets and Postovoit.  By contrast, she gave little weight to Dr. Dalley's first evaluation.

Ms. Valentine challenges the ALJ's weighing of the evidence, especially the psychological evaluations and reviews.  Ms. Valentine begins with Dr. Dalley's first evaluation.  She says the ALJ discounted Dr. Dalley's findings because she (Ms. Valentine) "presented [to him] with no symptoms, yet [he] still gave an opinion of marked limitations which was totally inconsistent with his examination."  (TR 18.)  Ms. Valentine is correct;

that is what the ALJ wrote at that point in her decision.
However, in fairness to the ALJ, her decision should be
considered as a whole.  The ALJ went on to discuss Dr.
Dalley's second evaluation.  She concluded her discussion
by writing, "Dr. Dalley indicated based on her
malingering presentation it would be difficult if not
impossible to determine how her reported symptoms would
affect her work activities.  Therefore, the undersigned
gives little weight **to any functional limitations listed**
for this reason."  (TR at 20 (emphasis added).)  While,
admittedly, the ALJ did not specifically mention the
limitations Dr. Dalley observed in 2011, it is reasonable
to infer she had those limitations in mind as she wrote
the two sentences quoted above.  In other words, it is
reasonable to infer the ALJ discounted Dr. Dalley's 2011
limitations, in part, because of Ms. Valentine's
malingering during the 2012 evaluation.

    Ms. Valentine also challenges the ALJ's decision to
give some weight, rather than full weight, to the
findings of Drs. Regets and Postovoit.  (TR 20.)  As will

16

be recalled, they both agreed her "ability to understand
and remember detailed instructions" is "[m]oderately
limited" (TR 61, 72); just as they both agreed her
"ability to perform activities within a schedule,
maintain regular attendance, and be punctual" is
"[m]oderately limited" (TR 62, 71).  The ALJ discounted
those findings on the ground those limitations were not
observed by health care providers at CHAS.  Ms. Valentine
takes issue with the ALJ's interpretation of the record.
According to Ms. Valentine, the ALJ overlooked CHAS
records that are consistent with the findings of Drs.
Regets and Postovoit.  Ms. Valentine has a point.  The
health care providers who examined Ms. Valentine did note
some of the same types of issues Drs. Regets and
Postovoit noted.  However, it must be remembered the ALJ
did not completely discount the opinions of Drs. Regets
and Postovoit.  To the contrary, the ALJ gave them "some
weight."  (TR 20.)  If, perhaps, the ALJ should have
given their opinions more weight, any error on her part
is harmless given the record as a whole.

17

**ASSESSING MS. VALENTINE'S CREDIBILITY**

A claimant's statements about her impairments, restrictions, and daily activities are evidence. 20 C.F.R. § 416.912(b)(3). By themselves, however, they are not enough to establish the existence of disability. 20 C.F.R. § 416.929(a). SSR 96-7p explains:

> No symptom or combination of symptoms can be the
> basis for a finding of disability, no matter how
> genuine the individual's complaints may appear
> to be, unless there are medical signs and
> laboratory findings demonstrating the existence
> of a medically determinable physical or mental
> impairment(s) that could reasonably be expected
> to produce the symptoms.

1996 WL 374186, at *1 (July 2, 1996). This means a claimant has a two-part burden of production: "(1) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments could reasonably be expected to (not that it did in fact) produce some degree of symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir.1996) (explaining *Cotton v. Bowen*, 799 F.2d 1403,

18

1407-08 (9th Cir.1986)).  Ms. Valentine fulfilled her burden of production.  The ALJ found, ""[C]laimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]"  (TR 18.) That being the case, the ALJ had to evaluate "the intensity, persistence, and functionally limiting effects of the symptoms" in order to determine "the extent to which the symptoms affect the individual's ability to do basic work activities."  SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).  "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects."  *Id.*

A credibility determination involves a careful examination of the record as a whole.  The ALJ must decide whether the claimant's "statements can be believed and accepted as true."  SSR 96-7p, 1996 WL 374186, at *4. If there is no evidence of malingering on the claimant's part, "the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes

specific findings stating clear and convincing reasons
for doing so." *Smolen*, 80 F.3d at 1283.  Here, evidence
of malingering emerged during Ms. Valentine's second
evaluation by Mahlon Dalley, Ph.D.  During the second
evaluation, which took place on March 3, 2012, Dr. Dalley
administered a number of tests.  (TR 201.)  The results
suggested a lack of effort on Ms. Valentine's part.
After looking at the results, Dr. Dalley concluded the
results of the tests were invalid.  (TR 203.)  He wrote,
"When Nicole is more motivated to give more realistic and
valid responses, a re-evaluation is recommended."  *Id*.
Ms. Valentine questions whether Dr. Dalley's diagnosis of
malingering is sustainable given the cognitive
limitations he observed during his prior evaluation on
June 3, 2011.  (TR 179, 180.)  She suggests the invalid
test results on March 3, 2012, were a function of
cognitive limitations rather than malingering.  As she
notes, Dr. Dalley recommended additional testing.  She
seems to be suggesting Dr. Dally was unsure of the
diagnosis he made on March 3rd.  If that is her position,

it is not supported by the record.  Dr. Dalley made a
specific finding:  on March 3rd, Ms. Valentine was
malingering.  Granted, he did recommend additional
testing; but his recommendation of additional testing was
a contingent recommendation.  He recommended reevaluation
only if Ms. Valentine became "more motivated to give more
realistic and valid responses[.]"  (TR 203.)  In no way
did Dr. Dalley's recommendation undercut his finding.
Given Ms. Valentine's performance on the tests he
administered, he decided she was malingering on March 3rd.
The ALJ properly considered Dr. Dalley's finding in
evaluating Ms. Valentine's credibility.  In view of Ms.
Valentine's malingering on March 3rd, it is debatable
whether the ALJ was bound by the clear-and-convincing-
reasons rule.  However, the Court need not resolve the
issue because the reasons the ALJ gave for discounting
Ms. Valentine's testimony are clear and convincing.

        Broadly speaking, the ALJ discounted Ms. Valentine's
testimony for two reasons.  (TR 21.)  To begin with, the
ALJ decided Ms. Valentine's description of her alleged

physical impairments (*i.e.*, foot, knee, and back pain)
was not supported by adequate medical evidence. *Id.* In
addition, the ALJ cited inconsistencies in the record.
*Id.* Ms. Valentine challenges the ALJ's reasoning.
According to Ms. Valentine, the ALJ failed to establish
an adequate basis for discounting her testimony.

At the administrative hearing, Ms. Valentine alleged
she suffers from foot, knee, and back pain. The ALJ
observed that Ms. Valentine had discussed her pain
symptoms with health care providers on two occasions
(*i.e.*, May 21, 2012, and June 29, 2012). Although, on
both occasions, Ms. Valentine complained of pain (TR 277,
282), health care providers never were able to
substantiate her complaints. The ALJ cited the paucity
of evidence at two different points in her decision. At
Step Two, she determined Ms. Valentine's foot, knee and
back pain do not significantly limit her ability to
engage in basic work activities. (TR 14-15.) At Step
Four, the ALJ cited the paucity of medical evidence as

one reason to question Ms. Valentine's credibility.  (TR 21.)

Ms. Valentine argues an ALJ may not consider the lack of evidence supporting a claimant's allegation of physical impairments when assessing the credibility of a claimant's allegation of mental impairments.  Ms. Valentine's argument is not supported by the law of this circuit.  In the Ninth Circuit, it is well established an ALJ may employ "ordinary techniques of credibility evaluation."  *Smolen*, 80 F.3d at 1284.  Such techniques include, but are not limited to, considering "the claimant's reputation for lying," together with any "prior inconsistent statements concerning the symptoms, and [any] **other testimony by the claimant that appears less than candid[.]**"  *Id.* (emphasis added).  Clearly, then, an ALJ has discretion to consider a wide range of information in assessing a claimant's credibility.  Nothing in the rule quoted above suggests an ALJ must compartmentalize evidence in the manner advocated by Ms. Valentine.  To the contrary, the above-quoted rule

implies an ALJ may consider problems with a claimant's testimony concerning her physical impairments when evaluating the credibility of her testimony concerning her mental impairments and vice versa.  The ALJ did not err by doing so in this case.

As explained above, the ALJ gave two reasons for discounting Ms. Valentine's testimony.  Besides citing the paucity of medical evidence, the ALJ also cited inconsistencies in the record.  At the hearing, Ms. Valentine said she struggled to perform basic tasks such as shopping and keeping her residence clean.  (TR 46, 48.)  By contrast, on May 21, 2012, she told a physician's assistant she was "'able to get in and out of car, go down stairs and perform activities of daily living.'"  (TR 21 (quoting TR 277).)  This was not the only statement Ms. Valentine made on May 21st about her physical limitations.  As the ALJ noted, Ms. Valentine also said she "'can't stand for more than a couple of hours [due to] weight.'"  (TR 21 (quoting TR 277).)  However, on June 29, 2012, Ms. Valentine told a

physician's assistant she "ha[d] been exercising, ha[d]
lost about 15 pounds.  [She was] [o]ut of a bad
relationship and 'feeling great'.'"  (TR 21 (quoting TR
282).)  This last statement was consistent with the
results of x-rays and the examination that took place on
June 29th.  On that date, a physician's assistant
observed "[r]ecent x-rays show minimal scoliosis, disk
space narrowing and arthrosis."  (TR 282.)  The
physician's assistant also noted "[n]ormal mobility" with
respect to Ms. Valentine's cervical and thoracic
vertebrae, (TR 21 (quoting TR 284)), and "[f]ull range of
motion" with respect to her knees and feet.  (TR 284.)
These findings tended to contradict Ms. Valentine's pain
complaints, a circumstance that concerned the ALJ.  The
ALJ's concern was heightened by evidence of malingering
on the tests that were administered by Dr. Dalley on
March 3, 2012.  (TR 21.)  There were other
inconsistencies that troubled the ALJ.  Although Ms.
Valentine complained of depression and anxiety (TR 277,
282), she was upbeat at both the June 29th exam and

another that took place on October 12, 2012.  At the
latter, she reported to a mental health professional,
"[S]he has new boyfriend, who has been supportive.  She
[i]s going to school, working part time, feels like her
motivation and mood are improved."  (TR 294.)

    Ms. Valentine objects to the ALJ's credibility
determination on several grounds.  Two have already been
addressed; namely, Ms. Valentine's contention that little
weight should be given to Dr. Dalley's 2012 malingering
diagnosis, and her contention that evidence relating to
her physical impairments is not relevant to her mental
impairments.  However, there is a third objection.  Ms.
Valentine submits the ALJ attached too much significance
to the generally positive comments she made to health
care providers during the summer and fall of 2012.  In
Ms. Valentine's opinion, the comments in question
reflected a temporary improvement.  As she points out,
"Occasional symptom-free periods -- and even the sporadic
ability to work -- are not inconsistent with disability."
*Lester v. Chater*, 81 F.3d 821, 833 (9th Cir.1995).  While

Ms. Valentine has correctly stated the law, a fair reading of the ALJ's decision reveals the ALJ considered Ms. Valentine's positive comments in light of the record as a whole.  The ALJ did not place undue weight upon her positive comments.  Rather, the comments were but one of a number of circumstances the ALJ weighed.  That being the case, the ALJ's consideration of Ms. Valentine's positive comments was not improper.

**CONCLUSION**

The ALJ's findings are supported by substantial evidence.  The conclusions she drew from her findings are reasonable.  She properly discounted Ms. Valentine's credibility, and any error in her weighing of the psychological evidence (if error there was) was harmless. The Court affirms the ALJ's decision.

**IT IS HEREBY ORDERED:**

1. The plaintiff's motion for summary judgment (**ECF No. 12**) is **denied**.

2. The defendant's motion for summary judgment (**ECF No. 13**) is **granted.**

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to file this Order, furnish copies to counsel, enter judgment accordingly, and close this case.

**DATED** this  10th  day of September, 2015.


                         Van Sickle
                       FRED VAN SICKLE
              Senior United States District Judge